UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOAN THOMPSON,

Plaintiff,

v.

CITY OF ST. CLAIR SHORES, et al.,

Defendants.

_____/

Case No. 15-cv-11167

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
ANTHONY P. PATTI

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [29]**

**I. INTRODUCTION**

On March 27, 2015, Joan Thompson ("Thompson" or "Plaintiff") filed a
Complaint against the City of St. Clair Shores ("St. Clair Shores"), and police
officers Stephen Stindt, Travis Crooks, and Jenna Conrad (collectively,
"Defendants"). Dkt. No. 1, p. 1 (Pg. ID No. 1). Thompson amended her complaint
on April 1, 2015, alleging use of excessive force by the individually-named
Defendants and a *Monell* claim against St. Clair Shores. Dkt. No. 3, p. 1–7 (Pg. ID
No. 19–25).

Presently before the Court is Defendants' Motion for Summary Judgment
[29], submitted July 6, 2016. Plaintiff responded on July 27, 2016. Dkt. No. 30.
Upon review of the briefing, the Court concludes that oral argument will not aid in

the resolution of the instant motion. Accordingly, the Court will resolve Defendant's present motion on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons discussed herein, the Court will **GRANT** in part and **DENY** in part Defendants' Motion for Summary Judgment [29].

## II. BACKGROUND

Thompson has rented a room in the back of a house belonging to Michael Rowell ("Michael") and Dorothy Hitchens-Hoenle ("Dorothy") since 2009. Dkt. No. 29-7, p. 6 (Pg. ID No. 323). In early April 2013, Michael's son Christopher Rowell ("Christopher") was living in the basement of the house and Christopher's 10-year-old son, Peyton, also resided at the house.

### 1.    The Basement Assault

On the night of April 9, 2013, Christopher and Peyton were in the basement, with Peyton playing a video game on the couch. Dkt. No. 29-2, p. 7 (Pg. ID No. 261). Christopher's girlfriend of one week, Lauren Casey, came over and was helping Christopher use sheets to cover furniture that he had "trash-picked" several days prior. Dkt. No. 29-2, p. 10 (Pg. ID No. 264). Dorothy and Michael were concerned that Christopher had invited Lauren to move in, which Christopher disputes. Dkt. No. 29-2, p. 10 (Pg. ID No. 264); Dkt. No. 30-6, p. 5 (Pg. ID No. 458). Michael, who had been drinking that evening, came down to the basement to

confront Lauren and Christopher about the alleged cohabitation. Dkt. No. 29-2, pp. 8, 10 (Pg. ID No. 262, 64).

Michael brought his handgun down to the basement with him, hoping to slap Christopher in the head with it. Dkt. No. 30-6, p. 5 (Pg. ID No. 458). Michael cocked the hammer of the gun, intending to frighten Christopher. *Id*. Although the gun was inside his father's hooded sweatshirt, both Christopher and Lauren heard the click of the hammer being pulled back. Dkt. No. 29-2, pp. 11–12 (Pg. ID No. 265–66); Dkt. No. 29-3, p. 10 (Pg. ID No. 282). After hearing the click, Christopher moved to stand between his father and directed Peyton to grab his things so that they could leave. Dkt. No. 29-2, pp. 13 (Pg. ID No. 267).

Michael pulled the gun out, Dkt. No. 30-6, p. 5 (Pg. ID No. 458), and Christopher alleges that Michael pointed it at him, resulting in a struggle. Dkt. No. 29-2, p. 13 (Pg. ID No. 267). During the altercation, Christopher allegedly took the gun from his father and called out to Dorothy, who ran down the stairs and retrieved the gun. *Id*.; Dkt. No. 29-7, p. 33 (Pg. ID No. 350). Michael alleges that he broke several ribs and punctured a lung during the struggle and fall to the floor. Dkt. No. 29-2, p. 14 (Pg. ID No. 268).

Dorothy and Thompson took Michael upstairs to evaluate his injuries. Dkt. No. 29-7, p. 34 (Pg. ID No. 351). Thompson, who previously worked as a

respiratory nurse, examined his ribs and believed them to be broken. *Id*. She advised Michael to get medical attention, but he refused. *Id*. at 34–35.

### 2. Michael's Arrest and Thompson's Intervention

Immediately after the struggle, Christopher, Lauren, and Peyton ran out of the house. Dkt. No. 29-2, p. 14 (Pg. ID No. 268). Lauren went directly to the police station and called Christopher to have him come and fill out a police report, which he did. *Id*. at 14–15. Lauren and Peyton confirmed Christopher's version of the events reported to the police. Dkt. No. 29-3, p. 6 (Pg. ID No. 278).

Several police officers went to the house and secured the exterior prior to having dispatch call Michael and asking him to come outside. *Id*. Dkt. No. 29-4, p. 5 (Pg. ID No. 288). Thompson did not want Michael to have to walk outside and thought the police should have come to the door to speak with him. Dkt. No. 29-7, p. 36 (Pg. ID No. 353). Nevertheless, Michael complied with dispatch's request and exited the house with his hands in the air, walking forward as directed. *Id*. at 37–38.

As Michael was following orders and walking towards the officers, Thompson decided to intervene. *Id*. at 38. Thompson walked out of the house, past the front porch and towards Michael, calling out to the officers. *Id*. at 38–39. The officers allege that Michael stopped complying with orders once Thompson emerged from the house. Dkt. No. 29-5, p. 7 (Pg. ID No. 301). Defendant officers,

-4-

Conrad, Stindt, and Crooks, recall Thompson yelling, "leave him alone!" repeatedly, Dkt. No. 29-4, p. 7 (Pg. ID No. 290); Dkt. No. 29-5, p. 7 (Pg. ID No. 301); Dkt. No. 29-6, p. 8 (Pg. ID No. 313), whereas Thompson and Michael believe that she was repeating "don't hurt him, his ribs are broken." Dkt. No. 29-7, p. 39 (Pg. ID No. 356); Dkt. No. 30-6, p. 6 (Pg. ID No. 459).

Conrad, Stindt, and Crooks report that Thompson was told to stop and get on the ground five or six times as she walked empty-handed towards Michael, but Thompson refused to comply. Dkt. No. 29-4, p. 7 (Pg. ID No. 290); Dkt. No. 29-5, p. 7 (Pg. ID No. 301); Dkt. No. 29-6, p. 8 (Pg. ID No. 313). Instead, as Thompson allegedly approached Michael, refusing to stop, she abruptly turned around and walked back towards the house. Dkt. No. 29-4, p. 7 (Pg. ID No. 290); Dkt. No. 29-5, p. 8 (Pg. ID No. 302); Dkt. No. 29-6, p. 8 (Pg. ID No. 313). As the handgun reported during the assault had not been secured, Stindt detained Thompson rather than allowing her to go back inside and possibly retrieve the gun.[1] *Id.* The officers

---

[1] The officer's fears about weapons in the home were not unfounded. Michael had multiple firearms in the house, including a forty-five caliber handgun, a semi-

allege that Stindt came up from behind Thompson and grabbed her arm. *Id*. Then, with one motion, Stindt claims he brought Thompson to her knees and then to the ground in a prone position. *Id*. Stindt asserts that he used the least amount of force necessary to lower Thompson to the ground. Dkt. No. 29-5, p. 8 (Pg. ID No. 302).

Conrad believes that Stindt handcuffed Thompson, while Stindt believes that he handcuffed Thompson with the assistance of Conrad or Crooks. Dkt. No. 29-4, p. 8 (Pg. ID No. 291); Dkt. No. 29-5, p. 9 (Pg. ID No. 303). None of the officers recall hearing Thompson ever mention a preexisting injury, being in pain, or needing any medical attention. Dkt. No. 29-4, p. 8 (Pg. ID No. 291); Dkt. No. 29-5, p. 8 (Pg. ID No. 302); Dkt. No. 29-6, p. 9 (Pg. ID No. 314). Crooks and Conrad both assert that they were nearby, but did not have any physical contact with Thompson as she was being placed on the ground. Dkt. No. 29-4, p. 8 (Pg. ID No. 291); Dkt. No. 29-6, p. 8 (Pg. ID No. 313).

Thompson's recollection of being detained by the officers differs. Thompson said she experienced "tunnel vision" and followed Michael outside. Dkt. No. 29-7,

---

automatic rifle, and a twelve-gauge shotgun. Dkt. No. 29-2, pp. 9–10 (Pg. ID No. 263–64). Thompson also kept a handgun in the house, but it does not appear that Thompson's gun was taken in connection with the felony assault. Dkt. No. 29-7, p. 32 (Pg. ID No. 349).

p. 38 (Pg. ID No. 355). She remembers the officers telling her to stop and claims that she stopped once she heard the order. *Id*. at 39. Thompson believes that the officers "[had] guns on [her]," so she turned around to go back inside. *Id*. She does not remember how many officers came near her, but claims she could tell they were coming up behind her because she could "feel [their] energy," "like static in the air." *Id*. at 40–41. Thompson said that as she felt them approaching, she raised her hands above her head and told the officers not to hurt her because she had neck surgery. *Id*. at 41. She claims that an officer came up behind her, took her hands and handcuffed her, grabbed her and forced her to her knees, and then put her on the ground on her stomach. *Id*. at 42. Thompson claims that the officer grabbed her by the neck and shoulder in the process of taking her to the ground. *Id*. It was that grab—between her right shoulder and neck when she was being put her on her knees—that she claims hurt her and out of which her excessive force claim arises. *Id*. at 43, 47.

Conrad sat with Thompson for about 15–20 minutes while the officers went through the house to remove Michael's guns. Dkt. No. 29-4, p. 9 (Pg. ID No. 292). Thompson alleges that Conrad searched her for weapons during that time and put her knee on Thompson's back. Dkt. No. 29-7, p. 45 (Pg. ID No. 362). Conrad disputes that she ever put a knee on Thompson's back. Dkt. No. 29-4, p. 9 (Pg. ID No. 292). After the house was cleared, the officers uncuffed Thompson. Dkt. No.

29-7, p. 44 (Pg. ID No. 361). Thompson claims that the officers did not assist her to her feet after uncuffing her, and that she had to crawl back inside because she could not stand. *Id*. at 46.

Thompson was not arrested or charged with an offense for her conduct that evening. Dkt. No. 29-7, p. 47 (Pg. ID No. 364). Michael was arrested and taken to jail. He pled guilty to two counts of assault and battery in September 2013. *Id*.; Dkt. No. 29-3, p. 8 (Pg. ID No. 280).

### 3. Thompson's Medical History and Injuries

#### a. Preexisting Injuries

Thompson has an extensive history of chronic illness predating the April 2013 incident. Additionally, Thompson has cognitive issues and problems with her memory that are a result of the medications she has been taking for many years. Dkt. No. 29-7, pp. 49–50 (Pg. ID No. 366–67).

Thompson has been in three car accidents, with the latest in 1993. *Id*. at 12. In 1993, Thompson claims that she experienced whiplash and hit her head, went to the emergency room, and was told that she had a neck injury. *Id*. Thompson claims to have also suffered from whiplash and a back injury caused by a car accident forty years ago, but was never treated for that injury. *Id*. at 13–14. In January 2006, she was treated for chronic neck pain caused by the car accidents and underwent a

steroid injection. *Id*. at 16. Additionally, also in 2006, Thompson was treated for a degenerative disc disease in her lumbar spine. *Id*.

Thompson previously worked as a respiratory therapist at St. John's Medical Center until 2007. *Id*. at 9–10. On the job, Thompson had injured her hip and back falling on a wet floor, but she returned to work after physical therapy. *Id*. Around 2007, Thompson had shoulder surgery for a torn rotator cuff. *Id*. at 10. In 2008, she began to be treated by Dr. Daniel Ryan for post-polio syndrome. *Id*. at 17. Thompson also experiences facial, ear, and neck pain caused by trigeminal neuralgia, which resulted from an ear infection in her youth. *Id*. at 23. She went on disability in 2009. *Id*. at 10. That same year, Thompson also underwent a neck fusion surgery. *Id*. at 25.

### b. Injuries from the April 2013 Incident

Thompson has not been diagnosed for any new conditions as a result of the incident with the police in April 2013. *Id*. at 18. She claims that the incident increased the pain she felt on the right side of her neck area and caused her to be dizzier than she had been previously. *Id*. at 50. The dizziness had been ongoing for long before the incident with the police, but several months after the incident, it became more intense and frequent. *Id*. at 18.

Thompson did not go to the emergency room after the incident or seek medical attention related to the incident until months after it occurred. *Id*. at 14.

She claims that she experienced immediate pain, but did not report it to her doctor, Dr. Paul Cullis, whom she saw for an unrelated appointment the day after the incident. *Id.*; Dkt. No. 30-11, pp. 2–3 (Pg. ID No. 510–11) (noting that on April 10, 2013, Thompson was not in any "acute distress"). In June 2013, Thompson went to St. John Hospital and Medical Center for lower back pain on her right side, but there are no references to her reporting the incident as the cause of her pain. Dkt. No. 30-12, pp. 2–4 (Pg. ID No. 515–17). In late September 2013, Thompson went to Blast Pain and received laser treatment for lower back pain, rotator cuff pain, and neck pain. Dkt. No. 29-7, p. 18 (Pg. ID No. 335). She also did not report any new onset of pain from the police incident during her treatment there, and she stated that Blast Pain's treatment hurt more than it helped. *Id.* at 18–19.

### c. Treatment for April 2013 Incident

In late October 2013, Thompson began seeing a therapist, Karen Webb. Dkt. No. 30-10, pp. 2–4 (Pg. ID No. 494–96). Thompson reported to Webb that she was experiencing fear, stress, and increased difficulty sleeping due to the incident with police over six months earlier. *Id.* at 3. In her November 2013 appointment, she complained of flashbacks, but the notes do not state that they were related to the police incident. *Id.* at 5. Webb's notes from Thompson's sessions do not mention the police incident again for a year. *Id.* at 10–11. From December 2013 until December 2014, her sessions focused on her distress resulting from her

grandchildren being placed into foster care, loss of friends, and her health problems. *Id.* at 6–9. Then, in April 2015, shortly after this lawsuit was filed, the incident with police began to appear regularly in her therapist's notes, specifically in relation to her stress from the present litigation. *Id.* at 12–13, 16 (Pg. ID No. 504–05, 508). Webb treated Thompson with talk-therapy and did not prescribe her any medication. Dkt. No. 29-7, p. 21 (Pg. ID No. 338).

October 2013 also marked the first time Thompson reported the incident and any resulting injuries to Dr. Cullis, the doctor she saw the day after the incident. Dkt. No. 30-11, pp. 4–5 (Pg. ID No. 512). She reported to him that her face hurt on the left side since the incident and that she believed she had post-traumatic stress disorder. *Id.* Thompson reported the incident with police to Dr. Ryan for the first time in February 2016, nearly three years after the April 2013 incident. Dkt. No. 30-9, p. 5 (Pg. ID No. 492).

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No

-11-

genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. DISCUSSION

In her Amended Complaint, Thompson brings two claims. In Count I, Thompson alleges that Defendant Officers violated her constitutional right to be free from unreasonable and excessive physical force. Dkt. No. 3, pp. 4–6 (Pg. ID No. 22–24). In Count II, Thompson brings a *Monell* claim against St. Clair Shores. *Id.* at 6–7. Defendants seek to have the Court dismiss all claims against St. Clair Shores and Defendant Officers. Dkt. No. 29, p. 32 (Pg., ID No. 253).

### 1.  Count I: Excessive Force

Thompson testified that her claim for excessive force arises solely out of the physical contact with the officer who handcuffed her and put her on the ground. Dkt. No. 29-7, p. 47 (Pg. ID No. 364). Thus, Thompson's first claim can be divided into two parts: first, a claim that Defendant Stindt used excessive force in

restraining her;[2] and second, a claim that Defendants Conrad and Crooks failed to intervene during Stindt's use of force.

### a.  Excessive Force Claim Against Stindt

A claim that law enforcement officials used excessive force in the course of seizing a person is properly analyzed under Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. This calculus of reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The subjective

---

[2] There is no factual dispute that Stindt was the officer who handcuffed Thompson and performed the takedown maneuver that Thompson reports as the only instance of excessive force. *See* Dkt. No. 29-4, p. 7 (Pg. ID No. 290); Dkt. No. 29-5, p. 8 (Pg. ID No. 302); Dkt. No. 29-6, p. 8 (Pg. ID No. 313); Dkt. No. 29-7, p. 47 (Pg. ID No. 364). Accordingly, the Court will not consider the disputed "knee in the back" restraint that Thompson alleged Conrad used during her search for weapons in the analysis of the excessive force claim. *See* Dkt. No. 29-7, p. 45 (Pg. ID No. 362).

intent or motivation of an officer should not be considered in determining whether his or her actions were objectively reasonable. *Id*. at 397.

"Ultimately, the Fourth Amendment 'reasonableness' test requires a 'careful balancing' of the individual interest in being free from unreasonable seizures and the important governmental interest in protecting the safety of its peace officers and the public. *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007). "The reasonableness of a particular use of force 'requires careful attention to the facts and circumstances of each particular case, including:' (1) 'the severity of the crime at issue,' (2) the immediacy of the threat posed by the suspect to the officers or others, and (3) whether the suspect is 'actively resisting arrest or attempting to evade arrest by flight.' " *Id.* (*quoting Graham*, 490 U.S. at 396). However, "[t]hese factors are not an exhaustive list, and the ultimate inquiry is whether the seizure was reasonable under the 'totality of the circumstances.' " *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008) (*quoting Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006)).

Thompson's excessive force claim is based on her contention that Stindt handcuffed her, grabbed her by the neck, and threw her to the ground, even though she complied with the officers' orders and was never charged with any crime. Dkt. No. 29-7, p. 47 (Pg. ID No. 364). Defendants' primary contention on summary judgment is that the force used was reasonable because Thompson had failed to

-14-

comply with orders and posed a risk of harm to the officers, who were in the middle of a high-risk felony arrest. Dkt. No. 29, pp. 19–20 (Pg. ID No. 240–41).

### a. Handcuffing

Under Sixth Circuit precedent, Thompson's handcuffing would not give rise to an excessive force claim, given the circumstances. "If a subject is unarmed, but nonetheless presents a risk to officer safety, handcuffing and detention in a cruiser may still be reasonable." *Kowolonek v. Moore*, 463 F. App'x 531, 536 (6th Cir. 2012); *see also Standifer v. Lacon*, 587 F. App'x 919, 922 (6th Cir. 2014) ("Police officers may constitutionally handcuff someone as a 'safety precaution,' even when they are 'merely detaining, but not arresting' the person."). This is not to say that officers may handcuff detainees in all circumstances, *see Bennett v. City of Eastpointe*, 410 F.3d 810, 840 (6th Cir. 2005) (finding *Terry* violation where defendant failed to point to "one single fact which supports a concern for officer safety" in handcuffing child bicyclists for riding double), but detention and handcuffing may be permissible where there is concern for officer safety or the suspect is a flight risk. *Kowolonek*, 463 F. App'x at 536–37.

Here, although it is unclear if Thompson was an immediate threat, the officers could not risk Thompson fleeing back into the house to retrieve the unsecured handgun, generating further danger for officers during Michael's high-

-15-

risk felony arrest. Even viewing the facts in the light most favorable to Thompson, the fact that she was handcuffed did not give rise to a constitutional violation.[3]

    b.  *Neck-Grab and Takedown Maneuver*

    With respect to the alleged neck-grab and takedown maneuver, the Court is to look first at the severity of Thompson's crime. *See Graham*, 490 U.S. at 396. While Michael's crime—a drunken assault with a handgun—would be considered "severe," Thompson was never implicated in the reported crime, nor was she ever arrested or charged with a crime. Although Thompson's actions in interfering with Michael's arrest could be considered criminal based solely on Defendants'

---

[3] The Sixth Circuit also recognizes an excessive force claim for "unduly tight or excessively forceful handcuffing during the course of a seizure," *Morrison v. Bd. Of Trustees Of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009), but Thompson has not asserted such a claim. She did not testify that her hands were taken aggressively, that she was cuffed aggressively, or that she complained about the tightness of her handcuffs. In fact, she testified at one point in her deposition that she did not even feel the handcuffs being placed on her. Dkt. No. 29-7, p. 43 (Pg. ID No. 360) ("Q: Did you get injured when the officer put the handcuffs on you? A: No, I didn't feel that."). To have properly pled this claim, Thompson would have needed to provide evidence that she complained the handcuffs were too tight, the officer ignored those complaints, and she experienced a physical injury resulting from the handcuffing. *Morrison*, 583 F.3d at 401.

testimony,[4] the Court must view the facts in the light most favorable to Thompson. Based on her and Michael's depositions, Thompson's act of telling officers not to hurt Michael because he had broken ribs could be considered a non-severe, non-criminal act.

Next, the Court must look to the immediacy of the threat Thompson posed to the officers or others. *See Graham*, 490 U.S. at 396. The crime to which the officers responded involved a dangerous weapon, which was unsecured at the point at which Thompson intervened in Michael's arrest. It is fair to say, therefore, that some threat existed. Nevertheless, there is also undisputed evidence that Thompson was unarmed when she went outside and that her hands were open and visible to officers. At the time, Thompson was a disabled sixty-one-year-old woman, standing at five-foot-two-inches tall and weighing 126 pounds. Dkt. No. 30-11, pp. 4–5 (Pg. ID No. 512). It does not appear that Thompson threatened use of physical force during the incident, nor did she hit, kick, or spit on the officers. Dkt. No. 29-

---

[4] Michigan law makes it a crime to knowingly and willfully obstruct an officer performing his or her duties, which is a felony punishable by no more than two years imprisonment or a fine of no more than $2,000.00, or both. MICH. COMP. LAWS § 750.479.

-17-

6, p. 10 (Pg. ID No. 315). Thus, although Thompson may have posed a threat given the totality of the circumstances, it is not clear that such a threat was grave and immediate when evidence is viewed in the light most favorable to her.

Finally, the Court must determine whether Thompson actively resisted arrest or attempted to evade arrest by flight. *See Graham*, 490 U.S. at 396. Defendants rely most heavily upon this factor, contending that Thompson cannot support her excessive force claim because her deposition established that she did not comply with the officers' verbal directives. Dkt. No. 29, p. 21 (Pg. ID No. 242). However, reading through Thompson's testimony, it appears that she claimed that she did follow the orders given to her. Dkt. No. 29-7, p. 39 (Pg. ID No. 356) ("Yes, and when they told me to stop, I stopped. . . And then they told me to turn around. So I says [sic] okay, I, I turned around and went back, headed back to where they told me to go back. . . And then they told me to stop. I stopped."). Michael's testimony also recalls that Thompson complied with the officers' orders. Dkt. No. 30-6, pp. 8, 12 (Pg. ID No. 461, 465) (stating that the officers only asked Thompson to stop once and that she complied). Accordingly, it appears there is an issue of material fact as to whether Thompson immediately complied with orders or actively resisted them.

Defendant cites to several cases where the Sixth Circuit has found that individuals who disobeyed a lawful order from law enforcement or otherwise

posed a risk of harm to the officer were permissibly restrained under the Fourth Amendment. Dkt. No. 29, p. 23 (Pg. ID No. 244). In *Hayden v. Green*, 640 F.3d 150, 154 (6th Cir. 2011), the Sixth Circuit reversed the denial of qualified immunity based on its determination that it was not objectively unreasonable for an officer to pull the plaintiff out of his car and put him on the ground. *Id*. at 153–54. The court noted that the officer used the minimum force necessary to remove the plaintiff from his vehicle after the plaintiff disregarded the officer's initial effort to stop his vehicle. *Id*. at 153. The officer did not "crush [the plaintiff], or pummel, kick, or knee" him once he was on the ground. *Id*. The officer also did not handcuff the plaintiff. *Id*. at 154.

In *Crehan v. Davis*, 713 F. Supp. 2d 688 (W.D. Mich. 2010), which Defendants also cite to, the plaintiff was convicted of Fleeing and Eluding in the Third Degree after he refused to pull his car over, although he was aware that a police vehicle had been trailing him with lights and sirens activated. *Id*. at 691. The plaintiff alleged that the police officer gave him a command to "get down," but did not provide sufficient time for him to do so before employing force severe enough to break his kneecap and cause chest contusions. *Id*. at 700. Nevertheless, the court in *Crehan* did not determine whether the officer's use of force was unreasonable, but rather found that there were no Sixth Circuit or Supreme Court decisions

predating April 2007 that clearly established performing a takedown maneuver under those circumstances constituted excessive force. *Id.*

Nothing in *Hayden* or *Crehan* suggests that a takedown maneuver is appropriate in every arrest or seizure. Rather, the *Hayden* case relied on undisputed video evidence that the plaintiff failed to comply with an officer's order before he was taken down. *See* 640 F.3d at 152. In the *Crehan* case, there was also no question of fact as to the plaintiff's refusal to comply with orders, as he had been convicted of a crime for his failure to stop his vehicle after being signaled to do so. 713 F. Supp. 2d at 691. In the present case, Defendants' evidence of Thompson's alleged failure to comply is contradicted not only by Thompson's testimony, but also by Michael's. Dkt. No. 29-7, p. 39 (Pg. ID No. 356); Dkt. No. 30-6, p. 8 (Pg. ID No. 461). Furthermore, there is no video evidence available to resolve the disputed compliance here, unlike in *Hayden*.

Taking the facts as alleged by Thompson, she was complying and already handcuffed at the time that Stindt utilized a "takedown" maneuver on her. There are additional factors that distinguish this case from those where physical force was found to be objectively reasonable as a matter of law. For example, there are no allegations that Thompson engaged in any preceding criminal activity, such as disregarding police indication to stop a vehicle, which would have increased the officers' perception of her non-compliance and dangerousness. *See Hayden*, 640

F.3d at 152 (finding it reasonable to pull plaintiff out of the car and to the ground after he left the scene of a hit-and-run and resisted a signal to stop the vehicle); *Crehan*, 713 F. Supp. 2d at 691 (finding takedown maneuver reasonable after plaintiff refused to comply with the order to stop the vehicle). Additionally, the Court does not have a video recording of the events surrounding the Michael's arrest and Thompson's restraint. *See Hayden*, 640 F.3d at 154 (disregarding plaintiff's claim that he complied where video disproved it). The depositions do not establish, as a matter of law, that a reasonable officer in Stindt's position would have construed Plaintiff as committing a severe crime, posing an immediate threat, or resisting seizure such that a takedown maneuver was necessary to effectuate her restraint.

Although Thompson's intervention in Michael's arrest was imprudent,[5] that alone is insufficient to grant summary judgment where several issues of material

---

[5] In Michigan, a third-party has no right to obstruct another's arrest, and a third-party may face criminal charges for resisting the arrest of another. *People v. Wess*, 235 Mich. App. 241, 242, 597 N.W.2d 215, 216 (1999) (affirming a sentence of probation for a man who saw the police arresting his friend, ran toward the arresting officers, and was sprayed with pepper spray and pushed to the ground when he ignored their warnings to stop); *City of Detroit v. Smith*, 235 Mich. App. 235, 238, 597 N.W.2d 247, 249 (1999) ("While Michigan remains part of a shrinking minority of states that retain an arrestee's right to resist an illegal arrest, we decline to extend that right to third-party intervenors."); *see also Darrah v. City of Oak Park*, 255 F.3d 301, 313 (6th Cir. 2001) (finding that a third-party had no

fact remain. It is for a jury to weigh the evidence and credibility of testimony in order to determine if Thompson complied with the officers' orders, when she was handcuffed, where she was touched during the takedown maneuver, and whether she adequately advised the officers of her preexisting injury. Accordingly, Defendants' request for summary judgment on the excessive force claim is denied.

### b.  Failure to Intervene Claim Against Conrad and Crooks

Next, the Court examines Thompson's excessive force claim in the context of a failure to intervene. To hold Conrad or Crooks liable for the use of excessive force, Thompson must prove that they "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). The testimony establishes that neither Conrad nor Crooks was an active participant in the alleged neck-grab and takedown that Thompson claims exacerbated her preexisting injuries. However, Conrad supervised Stindt and Crooks at the time of the incident, Dkt. No. 29-4, p. 4 (Pg. ID No. 287), and both Conrad and Crooks may have owed Thompson a duty of protection against the use of excessive force.

---

right to intervene physically on another's behalf, even if he thought the officer's use of force was excessive).

"Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner*, 119 F.3d at 429. "Where an act of excessive force unfolds in a matter of seconds, the second requirement is generally not satisfied." *Pennington v. Terry*, No. 15-5314, 2016 WL 1127774, at *13 (6th Cir. Mar. 23, 2016) (noting that there is generally insufficient time to intervene in types of excessive force lasting less than ten seconds); *see also Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (holding that an officer and nurse lacked opportunity to intercede in a takedown that lasted no more than ten seconds).

In the present case, there is a lack of clarity regarding the amount of time it took for the Stindt to put Thompson on the ground. Thompson testified that she did not know how long it took the officers to grab her hands, put them behind her back, and take her forward to the ground. Dkt. No. 29-7, p. 44 (Pg. ID No. 361). She initially stated that "[i]t was a swift movement" that "seemed like . . . a very short period of time," but later guessed that the hand-grab, handcuffing, and takedown maneuver all together took "fifteen seconds[,] because sometimes that can be a long time, you know." *Id*. She did not distinguish between the amount of time it took to grab her hands and place her in handcuffs, and the amount of time

-23-

that Stindt allegedly had his hands on her neck. *Id.* at 42. ("Q: How long did it take to put the handcuffs on? A: Not very long. Q: How long is that, seconds? A: Seconds."). Thompson alleges that she was telling the officers the entire time not to hurt her neck. *Id.*

Accordingly, there is a dispute of material fact as to the duration neck-grab and takedown maneuver, and a dispute as to whether Thompson audibly warned the officers not to touch her neck because she had neck surgery. It is not impossible for a rational jury to conclude that there was a reason to intervene, as well as the means and opportunity to do so, where a police officer saw a nearby officer grab the neck and perform a takedown maneuver on a compliant woman who had been repeatedly asking officers not to hurt her neck, and that use of force lasted fifteen seconds. As the Court is bound to view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party, the Court is unable to grant summary judgment to Conrad and Crooks on the failure to intervene portion of the excessive force claim.

### c.  Affirmative Defense of Qualified Immunity

Defendants' primary assertion is that they are entitled to summary judgment on the basis of qualified immunity. Dkt. No. 29, p. 15 (Pg. ID No. 236).

"A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable

to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison v. Bd. Of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). As noted above, a reasonable juror could find that Defendants used excessive force or failed to intervene when the evidence is viewed in the light most favorable to Thompson. However, Defendants would be entitled to summary judgment if Thompson's rights were not clearly established at the time of the incident.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. at 201. "Thus, in the excessive force context, it is not enough that a plaintiff establishes that the defendant's use of force was excessive under the Fourth Amendment." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). "To defeat qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed." *Id*. at 403–04.

The Sixth Circuit has recognized that "the right to be free from physical force when one is not resisting the police is a clearly established right." *Correa v.*

-25-

*Simone*, 528 F. App'x 531, 535 (6th Cir. 2013); *see also McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (holding that it was clearly established that use of a takedown maneuver was objectively unreasonable where the plaintiff was unarmed, made no aggressive gestures or statements, attempted to cooperate, and stated he would "go easy"); *Pershell v. Cook*, 430 F. App'x 410, 415 (6th Cir. 2011) (holding that using a leg sweep to knock a suspect to the ground was objectively unreasonable when the suspect was unarmed and "did not resist arrest or pose an immediate danger to officers"); *Lawler v. City of Taylor*, 268 F. App'x 384, 386–87 (6th Cir. 2008) (concluding that the officer's "use of force in throwing Lawler to the floor was disproportionate to any threat he faced," after Lawler had insulted the officer, refused to comply with orders, and "raised his left arm slightly"); *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006) (holding that a jury could find it was unreasonable to tackle a man who was "handcuffed, generally compliant, and obviously reacting in horror to the shooting of his dog").

Based on this precedent, if Thompson had been complying with officers' orders, advised them of her neck injury, and was already handcuffed, it would be clear to a reasonable officer that it would be unlawful to grab her neck and use a takedown maneuver to restrain her. The record presents a question of fact as to whether Thompson had been refusing to comply with officers' orders. Under these

-26-

circumstances, summary judgment on the issue of qualified immunity is not appropriate.

The failure to intervene claim against Conrad and Crooks raises additional questions of fact regarding the amount of time that the alleged force was used. Acknowledging that issues of material fact remain, "the right to be free from physical force when one is not resisting the police is a clearly established right," *Correa*, 528 F. App'x at 535, and a jury could find that Conrad and Crooks were in the vicinity of the incident and capable of intervening. Thus, Thompson's allegations, if true, could establish a constitutional violation that would have been reasonably known to the Defendants.

The jury must be the final arbiter of Defendants' claims of qualified immunity, since "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir. 1989). For the foregoing reasons, the Court **DENIES** Defendants' motion for summary judgment with respect to Count I.

### 2.  Count II: *Monell* Claim

"Municipalities are not vicariously liable for the actions of their employees." *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 260 (6th Cir. 2015), *cert. denied*, No. 15-1090, 2016 WL 776505 (U.S. May 16, 2016). Instead, a municipality may only be found responsible for § 1983 violations, and held liable

-27-

for damages, if the plaintiff demonstrates that the constitutional harm suffered was a result of the municipality's policy or custom. *Id*. "To succeed on a claim that a municipality has a policy or practice of constitutional violations, a plaintiff must identify an unconstitutional policy and must show that the policy led to a constitutional deprivation." *Zucker v. City of Farmington Hills*, No. 15-1202, 2016 WL 1019041, at *15 (6th Cir. Mar. 14, 2016).

The Sixth Circuit has identified four ways a plaintiff may prove the existence of a municipality's illegal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id*. Thus, to state a claim against St. Clair Shores, Thompson must identify official policies, actions of officials with final decision-making authority, a policy of inadequate training or supervision, or a custom or practice of tolerating the violation of federal rights.

Where no formal written policy exists, "the critical question is whether there is a particular custom or practice that 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom

or usage with the force of law.' " *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)).

### a. Inadequate Training or Supervision

Thompson's *Monell* claim is based on an alleged failure by St. Clair Shores to train and supervise its officers regarding excessive force. Dkt. No. 3, pp. 6–7 (Pg. ID No. 24–25).

To succeed on her failure to train or supervise claim, Thompson must prove that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.' " *Miller v. Sanilac Cty.*, 606 F.3d 240, 255 (6th Cir. 2010) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Where the constitutional violation was not alleged to be part of a pattern of past misconduct, "a supervisory official or a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost

inevitable, or would properly be characterized as substantially certain to result." *Hays v. Jefferson Cty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

In the present case, Thompson provides absolutely no evidence that there was a pattern of excessive force of which St. Clair Shores was made aware, but ignored. Nor has she established that there was a complete failure to train the entire police department force on the subject of excessive force. In fact, all of the Defendant Officers testified to having been trained on use of force within the past several years. Dkt. No. 29-4, p. 3 (Pg. ID No. 286); Dkt. No. 29-5, p. 3 (Pg. ID No. 297); Dkt. No. 29-6, p. 3 (Pg. ID No. 308). All of the Defendant Officers testified that they received regular performance evaluations at while working for St. Clair Shores, though Stindt reports that St. Clair Shores shifted to points-based performance evaluation system. Dkt. No. 29-4, p. 3 (Pg. ID No. 286); Dkt. No. 29-5, p. 3 (Pg. ID No. 297); Dkt. No. 29-6, p. 4 (Pg. ID No. 309).

Thompson's response claims that St. Clair Shores has failed to train officers on use of force because the training was "sporadic," and also claims that St. Clair Shores does not regularly conduct performance evaluations and monitor officer conduct. Dkt. No. 30, pp. 32–33 (Pg. ID No. 400–01). In support of her argument, Thompson cites to an unpublished ten-year-old district court case from the Southern District of Ohio where there was no evidence that a detective had been

-30-

evaluated a single time in thirty-two years of service. *Kammeyer v. City of Sharonville, Ohio*, No. 1:01-CV-00649, 2006 WL 1133241, at *11 (S.D. Ohio Apr. 27, 2006). Such facts differ markedly from those before the Court in the present case. Thompson has not provided any facts to support her argument that St. Clair Shores failed to train and evaluate officer performance.

Stindt has been working for the St. Clair Shores Police Department since 2001 and in that time, he has never been sued in his capacity as a police officer before and has never had a complaint filed against him for use of force or demeanor. Dkt. No. 29-5, pp. 3–4 (Pg. ID No. 297–98). He has been trained on use of force within the past several years and notes while he previously received performance evaluations every six months, he is now ranked monthly against his peers on a statistical performance evaluation. *Id*.

Conrad has been working for the St. Clair Shores Police Department since 1998 and in that time, she has never been sued in her capacity as a police officer before and has never had a complaint filed against her for use of force or demeanor. Dkt. No. 29-4, p. 3 (Pg. ID No. 286). She reports that she receives annual performance evaluations and has been trained on use of force in the past five years. *Id*.

Crooks has been working for the St. Clair Shores Police Department since 2001 and in that time, he has been sued one time, over ten years ago, and has never

had a complaint filed against him for use of force or demeanor. Dkt. No. 29-6, p. 4 (Pg. ID No. 309). He has been trained on use of force by St. Claire Shores within the last five years and notes that he has received performance evaluations every six months, which have never been below satisfactory. *Id.* at 3–4.

As Thompson's *Monell* claim is entirely without evidentiary support, the Court **GRANTS** the Defendants' Motion for Summary Judgment on this count and **DISMISSES** Count II.

### V. CONCLUSION

For the reasons stated herein, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment [29]. The Court **DISMISSES** Count II against St. Clair Shores.

IT IS SO ORDERED.

Dated: September 12, 2016                    s/Gershwin A. Drain
                                             Gershwin A. Drain
                                             United States District Court

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on **September 12, 2016.**

                                             s/Teresa McGovern
                                             Teresa McGovern
                                             Case Manager Generalist

-32-